# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSHUA J. NATHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 11 C 2231** |
| | ) | |
| **MORGAN STANLEY RENEWABLE** | ) | **Judge Joan H. Lefkow** |
| **DEVELOPMENT FUND, LLC; THIRD** | ) | |
| **PLANET WINDPOWER, LLC;** | ) | |
| **JAMES KUTEY; WALTER KAMP;** | ) | |
| **LORAINE WINDPARK PROJECT, LLC;** | ) | |
| **and TPW PETERSBURG, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Joshua Nathan filed a seven count second amended complaint[1] against Morgan Stanley

Renewable Development Fund, LLC ("Morgan Stanley"), Third Planet Windpower, LLC

("TPW"), Loraine Windpark Project, LLC ("Loraine"), TPW Petersburg, LLC ("Petersburg"),

and TPW employees James Kutey and Walter Kamp (collectively "defendants") alleging

violations of state and federal law stemming from his termination as general counsel of TPW.

Nathan's second amended complaint alleges seven counts: breach of contract (Count I),

declaratory judgment (Count II), unjust enrichment (Count III), promissory estoppel (Count IV),

promissory fraud (Count V), violation of the Illinois Wage Payment and Collection Act

---

[1] Defendants moved to dismiss Nathan's original complaint for failure to state a claim, lack of personal jurisdiction and improper venue. (Dkt. #17.) The court denied the motion without prejudice and gave the parties 30 days to engage in personal jurisdiction discovery. (Dkt. #20.) Nathan filed a first amended complaint, Dkt. #27, which the court dismissed for lack of subject matter jurisdiction. (Dkt. #36.) Nathan then filed a second amended complaint, which is the complaint currently before the court. (Dkt. #38.)

("WPCA"), 820 Ill. Comp. Stat. 115/1 *et seq*. (Count VI), and retaliatory discharge under Title

VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. §§ 2000e *et seq*. (Count

VII).[2]  Before the court is defendants' motion to dismiss the second amended complaint under

Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6).  (Dkt. #43.)  As an alternative

to dismissal under Rule 12(b)(3), defendants move to transfer venue to the Southern District of

Florida pursuant to 28 U.S.C. § 1404(a).  (*Id*.)  As set forth below, defendants' motions are

granted in part and denied in part.

## BACKGROUND[3]

Joshua Nathan is an attorney who has spent much of his career serving as in-house

counsel for wind energy companies.  (Compl. ¶ 20.)[4]  Nathan is a citizen of Illinois who resides

in Cook County.  (*Id*. ¶ 5.)  TPW is a limited liability wind energy development and operating

company organized under the laws of Delaware with its principal place of business in Florida.

(*Id*. ¶¶ 7, 19, Dkt. #32 ¶ 2.)[5]  Loraine and Petersburg are limited liability companies organized

under the laws of Delaware with their principal places of business in Texas and Nebraska,

_____

[2]  Attached to Nathan's second amended complaint are two Equal Employment Opportunity Commission ("EEOC") "right to sue" letters, but not Nathan's two original EEOC charges.  Upon re-filing, Nathan is instructed to attach his original EEOC charges and his right to sue letters.

[3]  The following facts are taken from the second amended complaint, unless otherwise noted, and are presumed true for the purpose of resolving the pending motion unless contradicted by defendants' affidavits.  In resolving the Rule 12(b)(2) and 12(b)(3) motions, the court may consider the affidavits attached to defendants' response.  *See Interlease Aviation Investors II (Aloha) L.L.C.* v. *Vanguard Airlines, Inc*., 262 F. Supp. 2d 898, 905 & 913 (N.D. Ill. 2003).  In resolving the Rule 12(b)(6) motion, the court may not consider the attached affidavits without converting the motion into one for summary judgment, which the court declines to do.  *See Covington* v. *Ill. Sec. Serv., Inc.*, 269 F.3d 863, 864–65 (7th Cir. 2001).

[4]  All references to the complaint are to the second amended complaint at docket #38.

[5]  Docket #32 is defendants' notification of affiliates pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.2.

respectively. (Compl. ¶¶ 10, 11; Dkt. #32 ¶¶ 3, 4.) TPW holds 100 percent of the membership interest in Loraine and Petersburg. (Dkt. #32 ¶¶ 3, 4.) Morgan Stanley is the parent company of TPW and owns "virtually all" of TPW. (Dkt. #32 ¶ 2.) Morgan Stanley is a limited liability company organized under the laws of Delaware with its principal place of business in New York; it is 100 percent directly owned by Morgan Stanley Renewables, Inc., a Delaware corporation that is not publicly held. (Compl. ¶ 6; Dkt. #32 ¶ 1.) Morgan Stanley operates and exists separately from TPW, and TPW has a separate management team that makes its day-to-day operational decisions. (Torres Aff. ¶ 8.)

In early 2008, Nathan began discussions with TPW's then-Chief Executive Officer Peter Mastic about joining the company. (Compl. ¶ 20.) After a series of meetings, Mastic invited Nathan to join TPW as its General Counsel and Vice President. (*Id.*) Nathan accepted the position, and the terms of his employment were memorialized in an April 11, 2008 e-mail from Mastic in Nevada to Nathan in Illinois ("employment contract"). (Kutey & Kamp Affs. ¶¶ 14–15.)[6] The contract states in relevant part,

> [Y]ou will be eligible for annual bonuses and [to] participate in project completion bonuses of at least $20,000 per MW or $1 million per project, whichever is less. Project completion bonuses will be awarded to the project team responsible for the successful completion and operation of each qualifying project. As Vice President, General Counsel, I expect that you will be involved in most or all of our projects and most or all of our project completion bonuses. . . .
>
> As a member of TPW management and an important contributor to our success, and within thirty (30) days after your relocation to Portland, you would receive one-half (½) of one point (out of 100) of the manager's share, subject to the vesting provisions contained in

---

[6] The affidavits of Kutey and Kamp contain the same factual allegations and the court will refer to them together.

the TPW Operating Agreement and Members Agreement, including time vesting over the four (4) year period ending November 9, 2010. Depending on our success in creating value for the TPW platform, this equity position could be worth $250,000 to $750,000 or more.

(Compl. Ex. A.) TPW offered Nathan the equity position to induce him to accept a compromised severance package,[7] and during the negotiations that immediately proceeded the contract Mastic told Nathan that "the fact that you would be getting an equity position that is already 40% vested and that is expected to be fully vested [by] November 9, 2010 or sooner, should moderate the need for severance." (Compl. ¶ 23.) Although the contract required Nathan to relocate to TPW's Portland office, the company later opened a Chicago office as a personal accommodation to Nathan based on his desire to remain in Illinois. (Kutey & Kamp Affs. ¶ 17.) TPW leased office space in Chicago from which Nathan worked. (*Id.*)

During his tenure, Nathan devoted a substantial amount of time to three wind farm projects, the Loraine I and II projects in Texas and the Petersburg project in Nebraska. (Compl. ¶ 25.) The Loraine I project achieved commercial operation in December 2009; the Loraine II and Petersburg projects are still incomplete. (*Id.* ¶¶ 27, 68.)

In early 2010, Mastic departed TPW and two Florida residents were promoted to leadership positions; James Kutey became Chief Development Officer and Walter Kamp became Chief Executive Officer. (*Id.* ¶ 28.) Jerry Johnson, who is based in TPW's California office, was in charge of all personnel matters. (Kutey & Kamp Aff. ¶ 11.) Almost immediately after Kutey and Kamp were promoted, the sole female member of the TPW management team began complaining of abusive conduct perpetrated by Kutey and Kamp, which she believed was

---

[7] The employment contract states, "I would be willing to provide up to one year severance in the event that you are terminated other than for cause, but this severance would be reduced day for day beginning November 10, 2009, and would terminate November 9, 2010." (Compl. Ex. A.)

directed at her.  (Compl. ¶ 29.)  She relayed her concerns to Nathan, informing him that Kutey and Kamp had verbally berated her, treated her unprofessionally, and cut off communications with her on numerous occasions to the point that her ability to execute her job functions was significantly impeded.  (*Id.* ¶ 30.)  Nathan investigated her claims and consulted outside employment counsel, who confirmed that the allegations required immediate attention.  (*Id.* ¶¶ 33, 34.)

Nathan decided to confront Kutey and Kamp and requested to meet with them when they were scheduled to be in Chicago on other business.  (*Id.* ¶ 35.)  After "practically begging" Kutey and Kamp to meet with him, the three men met in Chicago on August 17, 2010.  (*Id.* ¶ 36.)  Nathan relayed the female manager's complaints and explained the liability risk that Kutey and Kamp's behavior posed to TPW.  (*Id.*)  A series of conference calls and meetings took place the following week, including legal consultation with outside counsel and Morgan Stanley.  (*Id.*)  Thereafter, Kutey and Kamp's behavior towards Nathan became openly hostile.  (*Id.* ¶ 38.)  For the first time, the two men began raising performance issues about Nathan's work, despite having rated his work as excellent as recently as May 2010.  (*Id.* ¶¶ 37, 38.)  This retaliatory conduct culminated in February 2011 when Nathan was terminated from TPW.  (*Id.* ¶ 39.)  Two months later, Nathan filed the instant lawsuit.

Nathan claims that defendants unlawfully refused to (1) release his equity shares; (2) pay him a project completion bonus for the Loraine I project, which was complete; (3) consider his eligibility for an annual bonus; and (4) award him a project completion bonus for the Loraine II and Petersburg projects if and when those projects reach completion.  (*Id.* ¶¶ 46–49.)  According to Nathan, TPW, Kutey and Kamp did not act alone; rather, Morgan Stanley, TPW's parent

company, was a direct participant in the misconduct and was aware of and sanctioned each wrongful act directed at Nathan. (*Id.* ¶ 54.) With respect to the Loraine I project completion bonus, Kutey and Kamp told Nathan that Morgan Stanley "made the decision" that only those who worked at the Loraine I project site would receive a project completion bonus. (*Id.* ¶ 55.) Martin Torres, a Morgan Stanley employee and member of TPW's board, also told Nathan that he "discussed [Nathan's] situation with [Kutey and Kamp] and supports their position." (*Id.* ¶ 56.) Finally, as to Loraine and Petersburg, Nathan claims that Loraine and Petersburg (1) were solely influenced, governed and controlled by TPW; (2) were intentionally undercapitalized; and (3) commingled their funds with those of TPW. (Compl. ¶¶ 51–52.) As such, Nathan seeks to hold each defendant liable for multiple claims.

**ANALYSIS**

I.      **Subject Matter Jurisdiction**[8]

The court has federal question jurisdiction over Nathan's Title VII claim (Count VII against TPW and Morgan Stanley)[9] under 28 U.S.C. § 2000e-5(f)(3). Under 28 U.S.C. § 1367(a), the court may exercise supplemental jurisdiction over Nathan's state law claims against TPW and Morgan Stanley provided that "the state and federal claims derive from a common nucleus of operative facts." *Ammerman* v. *Sween*, 54 F.3d 423, 424 (7th Cir. 1995). "A loose factual connection between the claims is generally sufficient." *Id.*

Nathan alleges that he was terminated in retaliation for raising concerns about Kutey and Kamp's treatment of a female employee, and denied an equity position and bonuses in violation of his employment contract upon his termination. Because the facts surrounding Nathan's termination are relevant to his Title VII claim and to his state law claims, supplemental jurisdiction over Nathan's state law claims against TPW and Morgan Stanley is proper. *See Nieman* v. *Nationwide Mut. Ins. Co.*, No. 09-3304, 2009 WL 4928014, at *2 (C.D. Ill. Dec. 11, 2009) (exercising supplemental jurisdiction over plaintiff's state law claims because "[a]ll of his claims, state and federal, are based on the circumstances surrounding his termination from [defendant]"); *Parker* v. *Rockford Park Dist.*, No. 99 C 50073, 2001 WL 114405, at *1 (N.D. Ill.

---

[8]  This court previously dismissed Nathan's first amended complaint for lack of subject matter jurisdiction and directed him to file an amended complaint properly pleading the membership and citizenship of the LLC defendants. (Dkt. #36.) Upon refiling, Nathan again failed to properly allege diversity of citizenship, *see* Compl. ¶¶ 4, 5–11, which he acknowledged in his response. (*See* Plf.'s Resp. at 18–19 n.12.) Although the complaint states that it is brought under the court's diversity jurisdiction, *id.* ¶ 4, Nathan appears to abandon this position by stating that diversity jurisdiction is "irrelevant" because the court possesses federal question and supplemental jurisdiction over his claims. (*See id.*)

[9]  Nathan voluntarily dismissed Kutey and Kamp from Count VII. (Plf.'s Resp. at 18 n.10.)

Feb. 2, 2001) (finding that the court possessed original jurisdiction over plaintiff's Title VII

discrimination claim and supplemental jurisdiction over his state law breach of contract claim).

Moreover, because Nathan's federal and state law claims derive from a common nucleus of

operative fact, the court may exercise pendent party jurisdiction over the remaining defendants

under § 1367(a).  *See Mazurek* v. *Cook Cnty.*, No. 02 C 4897, 2003 WL 21266712, at *1 (N.D.

Ill. May 30, 2003); *Bartoli* v. *Applebee's Rest.*, No. 00 C 5954, 2001 WL 40798, at *2 (N.D. Ill.

Jan. 17, 2001).  Federal subject matter jurisdiction is therefore proper.

## II.     Personal Jurisdiction

Defendants move to dismiss the claims against Kutey, Kamp, Morgan Stanley, Loraine

and Petersburg for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

Nathan bears the burden of establishing that personal jurisdiction exists.  *See Tamburo* v.

*Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).  When the court rules on a defendant's Rule

12(b)(2) motion based solely on the submission of written materials, "the plaintiff need only

make out a *prima facie* case of personal jurisdiction."  *Purdue Research Found.* v. *Sanofi-*

*Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (internal quotation marks and citations

omitted).  In this situation, "[t]he allegations in [the plaintiff's] complaint are to be taken as true

unless controverted by the defendants' affidavits; and any conflicts in the affidavits are to be

resolved in [the plaintiff's] favor."  *Turnock* v. *Cope*, 816 F.2d 332, 333 (7th Cir. 1987),

*superceded by statute on other grounds*.  "[O]nce the defendant has submitted affidavits or other

evidence in opposition to the exercise of jurisdiction," however, "the plaintiff must go beyond

the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."  *Purdue*

*Research Found.*, 338 F.3d at 783; *see generally* 4 Charles Alan Wright et al., *Federal Practice and Procedure Civil* § 1067.6 (3d ed.).

A defendant is amenable to process under Rule 4(k) if (1) a federal statute authorizes service of process on him, or (2) he "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A) & (C). Title VII does not provide for nationwide service of process, *see* 42 U.S.C. § 2000e-5(f)(3), and as such, personal jurisdiction in this case is governed by the law of Illinois. Under the "catch all" provision of the Illinois long-arm statute, the court may exercise jurisdiction to the full extent permitted by United States and Illinois Constitutions. 735 Ill. Comp. Stat. 5/2-209(c). "Thus, if the contacts between a defendant and Illinois are sufficient to satisfy both federal and state due process concerns, the requirements of Illinois' long-arm statute have been met, and no other inquiry is necessary." *Kostal* v. *Pinkus Dermatopathology Lab., P.C.,* 827 N.E.2d 1031, 1036, 357 Ill. App. 3d 381, 293 Ill. Dec. 150 (2005). The Seventh Circuit has held that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction." *Hyatt Int'l Corp.* v. *Coco*, 302 F.3d 707, 715 (7th Cir. 2002). As such, "the state statutory and federal constitutional inquiries merge" and Nathan need only demonstrate that federal due process requirements have been met. *Tamburo*, 601 F.3d at 700.

Under the federal Due Process Clause, a defendant must have sufficient "minimum contacts" with the forum state such that the maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (internal quotation marks and citation omitted); *see Burger*

*King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). To satisfy due process, a defendant's connection with the forum state must be such that it is reasonably foreseeable that he will be haled into court there. *Burger King Corp.,* 471 U.S. at 474; *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

The requirements for general or specific jurisdiction must also be met. Where the events that form the basis of the lawsuit do not arise out of and are not related to any activities within the forum state, the court must possess general jurisdiction—that is to say, jurisdiction stemming from the defendant's "continuous and systematic" contacts with the forum state. *See Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). "The threshold for general jurisdiction is high; the contacts must be sufficiently extensive and pervasive to approximate physical presence," *Tamburo*, 601 F.3d at 701, so "the defendant could reasonably foresee being haled into court there on *any* matter." *Int'l Med. Grp., Inc.* v. *Am. Arbitration Ass'n, Inc.*, 312 F.3d 833, 847 (7th Cir. 2002).

Specific jurisdiction, on the other hand, grows out of a defendant's particular contacts with the state and is present when "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702; *see Mobile Anesthesiologists Chicago, LLC* v. *Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). "Personal jurisdiction in breach-of-contract actions often turns on whether the defendant 'purposefully availed' himself of the privilege of conducting business or engaging in a transaction in the forum state." *Tamburo*, 601 F.3d at 702.

Where the plaintiff's claims are based on intentional torts, however, "the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Id.*

## A.    Kutey and Kamp

Nathan alleges three claims against Kutey and Kamp: promissory estoppel (Count IV), promissory fraud (Count V) and violation of the WPCA (Count VI). Nathan does not allege that Kutey and Kamp maintained "continuous and systematic" contacts with Illinois; thus, Nathan must show that Kutey and Kamp purposefully directed their activities at Illinois or purposefully availed themselves of the privilege of conducting business in this state, and that Nathan's injury arises out of Kutey and Kamp's forum-related activities.

### 1.    Kutey and Kamp's Contacts with Illinois

Kutey and Kamp both reside and work in Florida and do not own any property, bank accounts, or other interests in Illinois. (Kutey & Kamp Affs. ¶¶ 2, 8, 23.) Kutey has visited Illinois approximately seven times, for a total of about eighteen days over the past four years, and Kamp has visited Illinois approximately six times, for a total of about fifteen days over the past three years. (*Id.* ¶ 20.) Each trip was made solely in Kutey and Kamp's capacity as a TPW representative and for TPW's benefit. (*Id.*) Although both Kutey and Kamp admit making business calls and sending business letters and e-mails to Nathan in Illinois, they were not involved in negotiating his employment contract nor were they in charge of personnel matters for TPW. (*Id.* ¶¶ 11, 13, 22.) Rather, Nathan negotiated his employment contract with Mastic a year and a half before Kutey and Kamp obtained their current positions at TPW. (*Id.* ¶¶ 10, 13.) The only incident alleged to have taken place in Illinois occurred on August 17, 2010, when Kutey and Kamp met with Nathan in Chicago to discuss the liability risk associated with their

treatment of a female manager. (Compl. ¶ 36.) This meeting occurred while Kutey and Kamp were in Chicago on business and only after Nathan "practically begg[ed]" them to meet with him. (*Id.*) Thereafter, Nathan alleges that Kutey and Kamp's treatment of him became openly hostile and culminated with his termination in February 2011. (*Id.* ¶¶ 34–35.) Nathan does not allege that any of this hostile conduct took place in Illinois or that he was terminated in the state.

### 2. Whether Nathan's Injury "Arises Out Of" Kutey and Kamp's Contacts with Illinois

Kutey and Kamp's contacts with Illinois amount to (1) sporadic business trips to the state over the course of three or four years; (2) business related phone calls, e-mails and letters directed to Nathan in the state; and (3) a meeting in Chicago on August 17, 2010. Even if it is assumed that Kutey and Kamp purposefully directed their activities at Illinois and/or purposefully availed themselves of conducting business in this state, Nathan has failed to show that his alleged injury arises out of Kutey and Kamp's contacts with the forum state.

Nathan does not allege that his claims arise from Kutey and Kamp's business trips to the state, nor does he claim that Kutey and Kamp promised or denied him compensation at their August 17, 2010 meeting in Chicago.[10] Rather, the only contacts that are relevant for the purposes of personal jurisdiction are the business calls, letters and e-mails that Kutey and Kamp made to Nathan in Illinois.

Nathan alleges that Kutey and Kamp "acknowledged TPW's obligation to deliver the equity position," "made promises and representations" that they would render performance under his employment contract, "subsequently reaffirmed" TPW's representations that Nathan would

---

[10] Although this meeting is relevant to Nathan's retaliatory discharge claim, Nathan voluntarily dismissed Kutey and Kamp from Count VII.

receive bonuses and an equity position, and then "[denied] Nathan some portion of [his] wages and/or final compensation." (Compl. ¶¶ 24, 77, 83, 95.) But Nathan does not state when, where or how these acknowledgments, promises, representations, affirmations, and denials took place, nor does he allege that his injury arose out of Kutey and Kamp's limited contacts with Illinois. Under these circumstances, it is not reasonably foreseeable that Kutey and Kamp would be haled into an Illinois court to defend against Nathan's claims. *See, e.g., McMurray* v. *Improvenet*, *Inc*., No. 00 C 7137, 2001 WL 561376, at *2–3 (N.D. Ill. May 22, 2001) (declining to exercise personal jurisdiction over the president of the plaintiff's employer where the president's contacts with Illinois were limited to four business visits to the state and weekly telephone calls with the plaintiff); *Krok* v. *Burns & Wilcox, Ltd.*, No. 98 C 5902, 1999 WL 262125, at *3 (N.D. Ill. Apr. 16, 1999) (holding that two non-resident officers did not have sufficient minimum contacts with Illinois to support personal jurisdiction where the non-resident defendants' contacts consisted of a few visits per year to transact business unrelated to the plaintiff's claims). For these reasons, the court concludes that it lacks personal jurisdiction over Kutey and Kamp.[11]

### B.    Loraine and Petersburg

Nathan alleges three claims against Loraine and Petersburg: breach of contract (Count I), declaratory judgment (Count II), and unjust enrichment (Count III). Nathan contends that, because the court possesses personal jurisdiction over TPW,[12] it also possesses personal jurisdiction over Loraine and Petersburg as TPW's alter egos. *See Chicago Regional Council of Carpenters* v. *Joseph J. Sciamanna, Inc.*, No. 08 C 4636, 2009 WL 1543892, at *2 (N.D. Ill.

---

[11] Having so concluded, the court need not consider whether the fiduciary shield doctrine prevents the court from exercising personal jurisdiction over Kutey and Kamp.

[12] Defendants do not dispute that the court possesses personal jurisdiction over TPW.

June 3, 2009) (stating that if the court has personal jurisdiction over one corporate defendant, then the court also possesses personal jurisdiction over its alter ego); *Quantum Color Graphics, LLC* v. *Fan Assoc'n Event Photo GmbH*, 185 F. Supp. 2d 897, 903 (N.D. Ill. 2002) ("In light of the claim that [defendants] are alter egos that really acted as one entity, the allegation that they acted collectively is sufficient to support an inference that each defendant has the same contacts."); *Torco Oil Co.* v. *Innovative Thermal Corp.*, 730 F. Supp. 126, 136 (N.D. Ill. 1989) ("Where the alter ego exception [to the fiduciary shield doctrine] is found to be applicable . . . a corporation's contacts are attributed to the individual.").

When a party uses veil piercing to establish personal jurisdiction, Illinois law governs the analysis. *Old Orchard Urban Ltd. P'ship* v. *Harry Rosen, Inc.*, 904 N.E.2d 1050, 1061, 389 Ill. App. 3d 58, 328 Ill. Dec. 540 (2009) ("[A]lthough the law of the state of incorporation applies when a party seeks to substantively pierce a corporation's veil, Illinois law governs the analysis where a party uses veil piercing to establish personal jurisdiction."). Under Illinois law, "a party seeking to disregard the corporate entity because the targeted corporation is merely the alter ego of the dominating personality 'must show that (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity.'" *Int'l Fin. Servs. Corp.* v. *Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) (quoting *Melko* v. *Dionisio*, 580 N.E.2d 586, 594, 219 Ill. App. 3d 1048, 162 Ill. Dec. 623 (1991) (emphasis omitted)). "Piercing [the] corporate veil is a task which courts should undertake reluctantly." *Pederson* v. *Paragon Pool Enters.*, 574 N.E.2d

165, 167, 214 Ill. App. 3d 815, 158 Ill. Dec. 371 (1991). Factors the court may consider in

determining whether there is sufficient unity of interest to disregard the corporate form include

> '(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe
> corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor
> corporation; (6) nonfunctioning of the other officers or directors; (7) absence of
> corporate records; (8) commingling of funds; (9) diversion of assets from the
> corporation by or to a stockholder or other person or entity to the detriment of
> creditors; (10) failure to maintain arm's-length relationships among related entities;
> and (11) whether, in fact, the corporation is a mere facade for the operation of the
> dominant stockholders.'

*Judson Atkinson Candies, Inc.* v. *Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir.

2008) (quoting *Fontana* v. *TLD Builders, Inc.*, 840 N.E.2d 767, 778, 362 Ill. App. 3d 491,

298 Ill. Dec. 654 (2005)).

Nathan has alleged some of these corporate shortcomings in his complaint. Specifically,

Nathan claims that Loraine and Petersburg (1) were solely influenced, governed and controlled

by TPW, for example, Loraine and Petersburg have no employees of their own and TPW officers

and personnel control and operate them; (2) were intentionally undercapitalized, for example,

Loraine and Petersburg had no independent source of revenue and TPW wired them money on

an as-needed basis; and (3) commingled their funds with those of TPW. (Compl. ¶¶ 51–52.)

Additionally, Nathan alleges that refusing to hold Loraine and Petersburg liable as TPW's alter

ego "would sanction a fraud or deception upon [him] and would promote injustice and

inequitable consequences." (*Id.* ¶ 52.) Although Kutey and Kamp admit that Loraine and

Petersburg are "affiliated with" and have the same officers as TPW, they state that Loraine and

Petersburg are "completely separate legal entities from TPW." (Kutey & Kamp Affs. ¶ 28.)

Moreover, according to Kutey and Kamp, the financing for Loraine and Petersburg is separate

from that of TPW and both Loraine and Petersburg "can operate and exist separately from TPW." (*Id.*)

The doctrine of piercing the corporate veil is typically invoked by a plaintiff seeking to hold a parent corporation liable for the actions of its subsidiary. Here, Nathan seeks to hold the subsidiaries, Loraine and Petersburg, liable for the actions of the parent, TPW. His position is perplexing given the nature of the allegations in the complaint. Nathan alleges that TPW and its employees, not Loraine and Petersburg, retaliated against him and denied him compensation due. It appears, therefore, that what Nathan is really trying to do is to pierce the corporate veil of TPW to reach its subsidiaries. His complaint, however, contains no factual allegations relevant to the determination of whether the court should disregard TPW's corporate form. Given the fact that Nathan worked for TPW, not its subsidiaries, it is unclear why Loraine and Petersburg should be held liable for TPW's actions. Nathan does not claim, for example, that TPW was merely a facade use by Loraine and Petersburg to avoid responsibility for their actions. *See McCracken* v. *Olson Cos.,* 500 N.E.2d 487, 492, 149 Ill. App. 3d 104, 102 Ill. Dec. 594 (1986). Nor does he claim that Loraine and Petersburg abused TPW's corporate form to the detriment of Nathan. *See Gallagher* v. *Reconco Builders, Inc*., 415 N.E.2d 560, 564–65, 91 Ill. App. 3d 999, 47 Ill. Dec. 555 (1980). Moreover, nothing in the record suggests that TPW would be unable to make Nathan whole should the court rule in his favor. Without further facts demonstrating why Loraine and Petersburg should be in this case, the court concludes that they should not.

### C.     Morgan Stanley

Nathan alleges seven claims against Morgan Stanley: breach of contract (Count I), declaratory judgment (Count II), unjust enrichment (Count III), promissory estoppel (Count IV),

promissory fraud (Count V), violation of the WPCA (Count VI), and retaliatory discharge

(Count VII).  He claims that the court possesses both general and specific jurisdiction over

Morgan Stanley.

### 1.  General Jurisdiction

Nathan argues that the court may exercise general personal jurisdiction over Morgan

Stanley because it does business in Illinois.  (Compl. ¶ 13.)  Nathan's assertion is contradicted by

the affidavit of Martin Torres, Vice President of Morgan Stanley, who states that

> [Morgan Stanley] is not an Illinois corporation, is not licensed to do business in
> Illinois, has no registered agent in Illinois, has no bank accounts in Illinois, does not
> sell any products in Illinois, has no operations in Illinois, does not advertise in
> Illinois, does not conduct business in Illinois, and has not entered into or performed
> any contracts in Illinois.  [Morgan Stanley] does not have, and has never had, any
> offices or employees in the State of Illinois.

(Torres Aff. ¶ 3.)  Nathan does not dispute these facts, and without further evidence, Nathan

cannot meet his *prima facie* burden.  *See Wessel Co., Inc.* v. *Surfers Publ'ns*, 633 F. Supp. 729,

730 (N.D. Ill. 1983) ("[I]f a defendant's affidavit contesting jurisdiction is not refuted by a

counter-affidavit filed by the plaintiff, the facts alleged in the defendant's affidavit are taken as

true.") (citation omitted).

## 2. Specific Jurisdiction

Nathan also alleges that the court possesses specific personal jurisdiction over Morgan Stanley because it was a "direct participant" in the wrongful conduct of TPW, Kutey and Kamp. (*See* Compl. ¶¶ 53–57.) The doctrine of direct participant liability "is a rarely-discussed exception to the usual requirements of piercing the corporate veil." *United States* v. *All Meat & Poultry Prods. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 833 (N.D. Ill. 2007). Under this doctrine, "a parent corporation may be held liable for acts of subsidiaries if the alleged wrong can be 'traced to the parent through the conduit of its own personnel and management' and the parent exerted control over the subsidiary 'in a way that surpasses the control exercised as an incident of ownership.'" *Id.* (quoting *Forsythe* v. *Clark USA, Inc.*, 836 N.E.2d 850, 854, 361 Ill. App. 3d 642, 297 Ill. Dec. 119 (2005) (*Forsythe I*), *aff'd* 864 N.E.2d 227, 224 Ill. 2d 274, 309 Ill. Dec. 361 (2007) (*Forsythe II*)).[13] "The doctrine is considered an exception to the usual requirements for piercing the corporate veil because its application does not depend upon large-scale disregard of corporate formalities, but rather is transaction-specific and focuses on the degree to which the parent used its ownership interest to 'command rather than merely cajole' the subsidiary." *Id.* (quoting *Esmark, Inc.* v. *N.L.R.B.*, 887 F.2d 739, 755 (7th Cir. 1989)).

Nathan cites no authority for his position that the court may exercise personal jurisdiction over Morgan Stanley because it was a "direct participant" in TPW, Kutey and Kamp's unlawful conduct. (*See* Plf.'s Resp. at 22.) Moreover, the allegations against Morgan Stanley that tend to

---

[13] The direct participant doctrine was first recognized by the Illinois Appellate Court in *Forsythe* v. *Clark USA, Inc.*, 836 N.E.2d 850, 856–57, 361 Ill. App. 3d 642, 297 Ill. Dec. 119 (2005), *aff'd Forsythe* v. *Clark USA, Inc.*, 864 N.E.2d 227, 224 Ill. 2d 274, 309 Ill. Dec. 361 (2007).

support this theory of liability are limited at best. Specifically, Nathan claims that (1) Morgan Stanley has a majority presence on TPW's board (Compl. ¶ 53); (2) Morgan Stanley was aware of and sanctioned each of the specific acts of retaliatory conduct and wrongful conduct directed toward Nathan (*id.* ¶ 54); (3) Kutey and Kamp consistently consulted with Morgan Stanley about business decisions and told Nathan that Morgan Stanley made the decision that only people who worked at the Loraine I project site would get project completion bonuses (*id.* ¶¶ 53, 55); and (4) Martin Torres, Vice President of Morgan Stanley, told Nathan that he had discussed Nathan's situation with Kutey and Kamp and "supports their position." (*Id.* ¶ 56). These allegations, claims Nathan, demonstrate that "Morgan Stanley exerted control over TPW in a way that surpasses the control exercised as an incident of ownership." (*Id.* ¶ 57.)

The well-settled rule is that "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 60, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998); *see also IDS Life Ins. Co.* v. *SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts."). To sustain a claim of direct participant liability, Nathan must come forth with "evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy *and* carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary." *Forsythe II*, 864 N.E.2d at 237. Thus, "[w]hen a corporation specifically directs an activity where injury is foreseeable, or if it mandates an overall course of action and then authorizes the manner in which specific

activities contributing to that course of action are undertaken, the corporation can be liable for foreseeable injuries." *Grady* v. *Ocwen Loan Servicing*, No. 11-cv-929928, 2012 WL 929928, at *2 (N.D. Ill. Mar. 19, 2012).

Nathan's allegations against Morgan Stanley do not point to direct participation but rather normal incidents of ownership. Simply being "aware of," "sanction[ing]," and "support[ing]" actions taken by TPW does not amount to mandating a particular course of action and carrying it out through specific direction and authorization. Even Nathan's allegation that Morgan Stanley "made the decision" to deny certain employees a Loraine I bonus is insufficient to demonstrate that Morgan Stanley mandated an overall course of action and authorized specific acts in an effort to carry out its decision. Moreover, Nathan has presented no evidence to rebut Torres's testimony that Morgan Stanley "operates and exists separately from TPW [and that] TPW has its own separate management which makes the day-to-day operational decisions, including personnel decisions." (Torres Aff. ¶ 8.) As such, Nathan has failed to plead facts sufficient to support the inference that Morgan Stanley used its ownership interest "'to command rather than merely cajole'" TPW, so as to justify haling Morgan Stanley into court in Illinois to defend against Nathan's claim that it was a "direct participant" in TPW's misconduct. *See Forsythe II*, 864 N.E.2d at 234 (quoting *Esmark*, 887 F.2d at 757). Defendants' motion to dismiss for lack of personal jurisdiction as to Morgan Stanley is granted.

**III.    Venue**

TPW next moves to dismiss for improper venue.  *See* Fed. R. Civ. P. 12(b)(3).  Nathan bears the burden of demonstrating venue in the Northern District of Illinois is proper.  *Interlease Aviation Investors II (Aloha) L.L.C.* v. *Vanguard Airlines, Inc*., 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003).  "In ruling on a motion to dismiss under Rule 12(b)(3), the court takes all the allegations in the complaint as true unless contradicted by an affidavit and may examine facts outside of the complaint."  *Id*.  Nathan's Title VII claim is the source of the court's original jurisdiction, and though not considered by the parties, Title VII contains its own venue provision.  *See* 42 U.S.C. § 2000e-5(f)(3).  "Section 5(f)(3) is not simply a supplement to 28 U.S.C. § 1391; it is the exclusive venue provision for all Title VII . . . actions."  *Gwin* v. *Reynolds & Reynolds Co.*, No. 01 C 770, 2001 WL 775969, at *1 (N.D. Ill. Jul. 10, 2001) (collecting cases); *see also Powell* v. *Sparrow Hosp.*, No. 09 C 3239, 2010 WL 582667, at *2 (N.D. Ill. Feb. 12, 2010) ("In all actions brought pursuant to Title VII, venue is determined pursuant to the statute's exclusive venue provision without consideration of 28 U.S.C. § 1391.").  Under this provision, venue is proper (1) in any judicial district in the state in which the unlawful employment practice is alleged to have been committed; (2) in the judicial district in which the employment records relevant to such practice are maintained and administered; or (3) in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(f)(3).  If the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.  *Id.*  Nathan need only satisfy one of these requirements to demonstrate that venue is proper in the Northern District of Illinois.  *Gwin*, 2001 WL 775969, at *1.

Nathan meets at least one of these requirements, namely, that he would have continued to work in Northern District of Illinois but for the alleged unlawful employment practice. (*See* Kutey & Kamp Affs. ¶ 17 (acknowledging that TPW leased office space in Chicago, Illinois from which Nathan worked)); *Digan*, 2010 WL 3385476, *3 (finding venue proper where the plaintiff lived and worked in Illinois, received notice of her termination here and would have continued to work in Illinois had she not been terminated). As such, venue in this district is proper, and TPW's motion to dismiss under Rule 12(b)(3) is denied.

## IV.     Failure to State a Claim under Rule 12(b)(6)

TPW has moved to dismiss six of Nathan's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the purpose of a Rule 12(b)(6) motion, the court will accept as true all material facts well pleaded in the complaint, and will view those facts in the light most favorable to Nathan. *See Mescall* v. *Burrus*, 603 F.2d 1266, 1269 (7th Cir. 1979). The factual allegations must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 684, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("*Twombly* expounded the pleading standard for all civil actions[.]" (internal quotation marks omitted)). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis, but must also establish that the requested relief is plausible on its face. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

## A.    Count I:  Breach of Contract[14]

Nathan claims that TPW breached his employment contract by failing to (1) release his equity shares; (2) pay him a project completion bonus for the Loraine I project, which was complete; and (3) consider his eligibility for an annual bonus in good faith.  To establish a claim for breach of contract, a plaintiff must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff."  *Henderson-Smith & Assocs., Inc*. v. *Nahamani Family Serv. Ctr., Inc*., 752 N.E.2d 33, 43, 323 Ill. App. 3d 15, 256 Ill. Dec. 488 (2001).  "If the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract, as a matter of law."  *Meyer* v. *Marilyn Miglin, Inc.,* 652 N.E.2d 1233, 1238, 273 Ill. App. 3d 882, 210 Ill. Dec. 257 (1995).  When the provisions of a contract are subject to more than one reasonable interpretation, however, the contract is ambiguous and extrinsic evidence may be admissible to aid in ascertaining the intent of the parties.  *See Wald* v. *Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1146, 175 Ill. App. 3d 607, 125 Ill. Dec. 62 (1988).  Whether a contract is ambiguous is a question of law for the court to decide.  *Hubbard St. Lofts LLC* v. *Inland Bank*, 963 N.E.2d 262, 271, 357 Ill. Dec. 309 (Ill. App. Ct. 2011).  If the contract

---

[14]  Nathan's employment contract does not contain a choice of law provision.  A federal court exercising federal question jurisdiction applies the choice of law rules of the state in which it sits when deciding pendent state law claims.  *See Baltimore Orioles, Inc.* v. *Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986).  TPW consistently cites to Illinois law throughout its brief, but states in a footnote that it "do[es] not concede that Illinois choice of law rules require that Illinois law govern Plaintiff's claims."  (Def.s' Mot. to Dismiss at 2 n.2.)  "A court, however, may not raise a choice of law question *sua sponte*; for choice of law to even be considered, one of the parties must actually raise and *argue* a potential conflict between the forum's law and the foreign entity's law."  *Protective Ins. Co.* v. *Montgomery Tank Lines, Inc.*, No. 89 C 2793, 1989 WL 152527, at *2 (N.D. Ill. Dec. 8, 1989) (emphasis added).  Neither party has argued that Illinois law does not govern Nathan's claims, and the court will apply Illinois substantive law in resolving the present motion.

language is ambiguous, however, "the language is a question of fact which a [court] cannot properly determine on a motion to dismiss." *Quake Constr., Inc.* v. *Am. Airlines, Inc*., 565 N.E.2d 990, 994, 141 Ill. 2d 281, 152 Ill. Dec. 308 (1990).

TPW contends that any compensation promised Nathan was at TPW's discretion and, therefore, it did not breach Nathan's employment contract by declining to award him an equity position, an annual bonus and a project completion bonus.[15] TPW states that Nathan was merely *eligible* for an equity position, an annual bonus and a project completion bonus, but was not *entitled* to this compensation under the terms of the contract. As to the equity position, the contract states that Nathan's receipt of equity shares was "subject to" the vesting provisions of the TPW Operating Agreement and Members Agreement,[16] and "depend[ed] on [management's] success in creating value for the TPW platform." (Compl. Ex. A.)[17] Moreover, the contract states that the Loraine I project completion bonus would be awarded only to the "responsible"

---

[15] TPW also argues that Nathan failed to allege that he met all contractual conditions precedent, thereby depriving him of a right to relief. Nathan, however, alleges that he "performed all his duties pursuant to the Contract" and that "all other conditions precedent to the contract have been satisfied, except that Loraine II and Petersburg have not yet been completed." (Compl. ¶¶ 50, 60.) Unlike the plaintiff in *Citicorp Real Estate, Inc.* v. *Cadillac Fairview Corp.*, 877 F. Supp. 443, 444, (N.D. Ill. 1995), the case cited by TPW, Nathan specifically alleged that he performed all contractual conditions required of him.

[16] The relevant provisions are unclear because the TPW Operating Agreement and Members Agreement are not part of the record.

[17] The relevant provision states that "as a member of TPW management and an important contributor to our success, and within thirty (30) days after your relocation to Portland, you would receive one-half (½) of one point (out of 100) of the manager's share, subject to the vesting provisions contained in the TPW Operating Agreement and Members Agreement, including time vesting over the four (4) year period ending November 9, 2010. Depending on our success in creating value for the TPW platform, this equity position could be worth $250,000 to $750,000 or more." (Compl. Ex. A.)

project team for the "successful completion" and "operation" of each "qualifying project." (*Id.*)[18] This language, asserts TPW, demonstrates that Nathan's equity position and project completion bonus were awarded at the sole discretion of TPW. *See Lillian* v. *Peak6 Invs., L.P.*, 417 F.3d 667, 670 (7th Cir. 2005) (affirming summary judgment for employer where employment letter stated that employee would be "eligible for a year-end discretionary bonus . . . based both on the profitability of the company and your contributions to the company's success."); *Collins* v. *Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1408–09 (C.D. Ill. 1987) (finding bonus discretionary where employment contract stated that plaintiff's compensation "shall consist of a basic salary with or without supplementation by way of bonuses, special awards or allowances"); *Cresswell* v. *Bausch & Lomb, Inc.*, No. 85 C 5822, 1986 WL 13528, at *5–6 (N.D. Ill. Nov. 21, 1986) (granting summary judgment for employer where employee was told that he would be "eligible to participate" in the company's bonus plan depending upon his handling of the German office, his efforts in signing up dealers, and his ability to meet job objectives).

Despite the language cited by TPW, Nathan's breach of contract claim does not fail as a matter of law. In contrast to *Lillian*, Nathan's employment contract does not explicitly state that the disputed compensation is discretionary. Although *Cresswell* is closer on the facts, other language in Nathan's employment contract supports the position that his compensation was not discretionary. For example, the contract states that "[p]roject completion bonuses *will* be awarded to the project team responsible for the successful completion and operation of each

---

[18] The relevant provision states that "you will be eligible for annual bonuses and [to] participate in project completion bonuses of at least $20,000 per MW or $1 million per project, whichever is less. Project completion bonuses will be awarded to the project team responsible for the successful completion and operation of each qualifying project. As Vice President, General Counsel, I expect that you will be involved in most or all of our projects and most or all of our project completion bonuses." (Compl. Ex. A.)

qualifying project," and that Nathan was expected "to be involved in *most or all*" of TPW's project completion bonuses.  (Compl. Ex. A (emphasis added).)  As for the equity shares, the contract states that "[Nathan] *would* receive one-half (½) of one point (out of 100) of the manager's shares," which "could be worth $250,000 to $750,000, or more."  (*Id.* (emphasis added).)  At a minimum, this language creates an ambiguity as to whether the parties intended for Nathan to receive the compensation at issue.  TPW's motion to dismiss Count I as to the equity position and the Loraine I project completion bonus is denied.

TPW makes the same argument regarding the annual bonus, which Nathan admits was discretionary, but claims he is still entitled to because TPW failed to reasonably evaluate his eligibility before denying him the bonus.  The covenant of good faith and fair dealing requires a party to execute its contractual discretion "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."  *Resolution Trust Corp.* v. *Holtzman*, 618 N.E.2d 418, 424, 248 Ill. App. 3d 105, 187 Ill. Dec. 827 (1993); *see also* Restatement (Second) of Contracts § 205 (1981).  The purpose of the covenant is "to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract."  *Gore* v. *Ind. Ins. Co.*, 876 N.E.2d 156, 161, 376 Ill. App. 3d 282, 315 Ill. Dec. 156 (2007).  Thus, "[i]f a contract vests a party with discretion and that party does not exercise the discretion in good faith, that can lead to a viable claim for breach of good faith and fair dealing."  *Visco Fin. Serv., Ltd.*, No. 08 C 4029, 2008 WL 4900530, at *3 (N.D. Ill. Nov. 13, 2008) (citing *Mid-West Energy Consultants, Inc.* v. *Covenant Home, Inc.*, 815 N.E.2d 911, 916, 352 Ill. App. 3d 160, 287 Ill. Dec. 267 (2004)); *see Schnell* v.

*Applied Power, Inc.*, No. 01 C 41, 2002 WL 1732364, at *2 (N.D. Ill. July 26, 2002) (implied covenant of good faith required the employer "to use good faith in establishing the performance measures for calculating [the plaintiff's] bonus"). Here, Nathan has alleged that TPW "failed to award him any discretionary bonus in 2010 [and that] TPW's failure to evaluate the award of any discretionary bonus in good faith constitutes a breach of the Contract." (Compl. ¶ 49.) This is sufficient to state a claim upon which relief may be granted.

### B.      Count II:  Declaratory Judgment

In Count II Nathan seeks a declaratory judgment against TPW to determine whether he is entitled to a project completion bonus for the Loraine II and Petersburg projects once those projects reach completion. The Declaratory Judgment Act limits issuance of a declaratory judgment to cases of "actual controversy." 28 U.S.C. § 2201(a). If no actual controversy exists, the court lacks subject matter jurisdiction to consider the claim. *Aetna Life Ins. Co. of Hartford, Conn.* v. *Haworth*, 300 U.S. 227, 239–40, 57 S. Ct. 461, 81 L. Ed. 617 (1937); *Alcan Aluminum Ltd.* v. *Dep't of Revenue of State of Or.*, 724 F.2d 1294, 1298 (7th Cir. 1984). "The test for whether an action for declaratory relief presents an actual controversy for resolution turns on whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Alcan Aluminum Ltd.*, 724 F.2d at 1298 (quoting *Md. Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)). "This 'actual controversy' requirement is equivalent to Article III's case-or-controversy requirement and thus incorporates Article III doctrines of ripeness and standing." *Geisha, LLC* v. *Tuccillo*, 525 F. Supp. 2d 1002, 1009–1010 (N.D. Ill. 2007) (internal citation omitted); *see also Coffman* v. *Breeze Corp.*, 323 U.S. 316, 324, 65 S. Ct.

298, 89 L. Ed. 264 (1945) (A declaratory judgment "may not be the medium for securing an advisory opinion in a controversy which has not arisen.").  The party seeking the declaratory judgment bears the burden of demonstrating that an actual controversy exists, *Geisha, LLC*, 525 F. Supp. 2d at 1010, and even if jurisdiction is proper, the court has discretion to decline to exercise it.  *Int'l Harvester Co.* v. *Deere & Co.*, 623 F.2d 1207, 1217 (7th Cir. 1980).

TPW argues that Nathan's declaratory judgment claim should be dismissed because it is duplicative of the relief sought in his breach of contract claim and therefore serves no useful purpose.  Nathan counters that his breach of contract claim applies only to sums due and owing under his employment contract and because the Loraine II and Petersburg projects are incomplete, the bonuses for these projects are not encompassed by the breach of contract claim.  Reading the complaint, the court agrees with Nathan that his breach of contract claim excludes the Loraine II and Petersburg bonuses.  Nathan, however, has not shown that his declaratory judgment claim is ripe for adjudication.

Nathan's claim can be analogized to an indemnity claim where the court is asked to interpret an existing contract between two parties to determine whether one party must indemnify the other, if and when the first party becomes liable.  In both circumstances, the financial obligation of one party is dependent on a future event, which may or may not occur.  The court has explained that

> [a]s a general rule, decisions about indemnity should be postponed until the underlying liability has been established.  This rule is in place because a declaration regarding the duty to indemnify may have no real-world impact if no liability arises from the underlying litigation.  The declaration could therefore amount to an impermissible advisory opinion.  Such declarations are also ill-advised because they consume judicial time in order to produce a decision that may turn out to be irrelevant.

*Molex Inc.* v. *Wyler*, 334 F. Supp. 2d 1083, 1087 (N.D. Ill. 2004) (internal quotation marks and citations omitted); *see also Gen. Ins. Co. of Am.* v. *Clark Mall, Corp.*, No. 08 C 2787, 2012 WL 254235, at *2 (N.D. Ill. Jan. 27, 2012) ("Since usually an insurance company's duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit, decisions about indemnity should be postponed until the underlying liability has been established.") (internal quotation marks and citations omitted). Only where the harm is "sufficiently probable" should the court proceed. *Molex Inc.*, 334 F. Supp. 2d at 1087; *see also Bankers Trust Co.* v. *Old Republic Ins. Co.*, 959 F.2d 677, 681 (7th Cir. 1992).

Here, Nathan has not shown that injury is probable and instead alleges that he is entitled to a bonus for the Loraine II and Petersburg projects *"if and when* those projects are completed." (Compl. ¶ 68 (emphasis added)). He makes no claim as to the likelihood that these projects will be completed or the time frame in which these projects will become operational. Nor does he allege that he is experiencing any ongoing harm in the interim. Although judicial economy is best served by adjudicating all of Nathan's claims at one time, Nathan must show that his declaratory judgment claim does not involve "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13B *Federal Practice & Procedure Civil* § 3532. Nathan must plead facts tending to show that his claim is ripe for adjudication. TPW's motion to dismiss Count II is granted without prejudice. The court will allow Nathan to replead this claim.

**C.      Count III:  Unjust Enrichment and Count IV:  Promissory Estoppel**[19]

---

[19] The second amended complaint also alleges a claim for "detrimental reliance." Detrimental

(continued...)

As an alternative to Count I, Nathan pleads an unjust enrichment claim and promissory estoppel claim against TPW. TPW moves to dismiss both claims arguing that quasi-contractual relief is unavailable when an express contract governs the relationship between the parties. TPW is correct that "[u]nder Illinois law, promissory estoppel and unjust enrichment are unavailable where the parties have entered into an express contract." *Sharrow Grp.* v. *Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004); *see also Prodromos* v. *Poulos*, 560 N.E.2d 942, 948, 202 Ill. App. 3d 1024, 148 Ill. Dec. 345 (1991) ("As a rule, plaintiffs cannot pursue quasi-contractual claims where there is an express contract between the parties."). Rule 8, however, allows a plaintiff to plead inconsistent claims in the alternative. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). As such, a "plaintiff may plead breach of contract in one count and unjust enrichment and promissory estoppel in others, [but he] may not include allegations of an express contract, which governs the relationship of the parties, in the counts for unjust enrichment and promissory estoppel." *Sharrow Grp.*, 2004 WL 2806193, at *3. Because Counts III incorporate paragraphs 1 through 57 of the complaint, *see* Compl. ¶¶ 70, 75, which repeatedly allege the existence of an express contract between Nathan and TPW, these claims cannot proceed. (*See, e.g.*, Compl. ¶¶ 21–23, 43–46, 48–50.)

Nathan argues that because the parties disagree as to the terms of the contract, his quasi-contractual claims may proceed, citing *Argonaut Insurance Co.* v. *Broadspire Services, Inc.*, No.

---

(...continued)
reliance is not an independent cause of action in Illinois; it is an element of a promissory estoppel claim. *Calvin* v. *Leitner Thomas Grp.*, No. 00 C 8055, 2003 WL 1720008, at *7 (N.D. Ill. Mar. 31, 2003). Nathan acknowledges this fact in his response, which states, "Plaintiff pled a promissory estoppel claim, not an entirely separate cause of action called 'detrimental reliance.'" (Plf.'s Resp. at 12 n.5.)

05 C 218, 2008 WL 4346418, at *4 (N.D. Ill. Mar. 28, 2008), in support. In *Argonaut Insurance*, the court allowed the plaintiff to plead promissory estoppel and unjust enrichment claims in the alternative to its breach of contract claim stating that when the contractual provisions in question have been found ambiguous, "it is inappropriate to dismiss the quasi-contractual counts." *Id.* Unlike Nathan, however, the plaintiff in *Argonaut Insurance* "expressly assume[d] there [was] no contractual obligation" in its alternative pleadings. *Id.* Thus, *Argonaut Insurance* cannot save Nathan's deficient unjust enrichment and promissory estoppel claims.[20] Counts III and IV are dismissed without prejudice as to TPW.

## D. Count V: Promissory Fraud

Nathan's promissory fraud claim against TPW must be dismissed because the claim does "state with particularity the circumstances" constituting the fraud perpetrated on Nathan. Fed. R. Civ. P. Rule 9(b). Under Illinois law, a promissory fraud claim must allege a scheme to defraud. *See Desnick* v. *Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) ("promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy") (applying Illinois law); *Ault* v. *C.C. Servs., Inc.*, 597 N.E.2d 720, 723, 232 Ill. App. 3d 269, 173 Ill. Dec. 746 (1992) ("promises are actionable if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud"); *Zaborowski* v. *Hoffman Rosner Corp.*, 356 N.E.2d 653,

---

[20] Nathan also cites *Tibor Machine Products, Inc.* v. *Freudenberg-Nok General Partnership*, No. 94 C 7635, 1996 WL 535338, at *4 (N.D. Ill. Sept. 19, 1996), which states that courts "have declined to dismiss a promissory estoppel claim where the terms of the alleged contract between the parties are not yet clear." The *Tibor* court, however, did not address whether the counter-plaintiff expressly alleged the existence of a contract in its promissory estoppel claim as Nathan does here.

656, 43 Ill. App. 3d 21, 1 Ill. Dec. 465 (1976) ("It is not enough, however, that the party make a false promise not intending to keep it; the total facts must show a scheme or device to defraud.") To meet the particularity standard of Rule 9(b), Nathan "must describe the time, place and particular contents of the false representations, as well as the identity of the party making the misrepresentation and what was obtained or given up thereby." *Harris Trust & Sav. Bank* v. *Ellis*, 609 F. Supp. 1118, 1123 (N.D. Ill. 1985) (internal quotation marks and citation omitted). A complaint fails to meet the demands of Rule 9(b) where, for example, "[t]he majority of [the] allegations . . . fail to state with specificity the time or circumstances under which the alleged violations or fraudulent acts took place [and] . . . the time, place and particular contents of the false statements." *D & G Enters.* v. *Cont'l Ill. Nat'l Bank & Trust Co.*, 574 F. Supp. 263, 267–68 (N.D. Ill. 1983) (internal quotation marks omitted).

Nathan has failed to plead his fraud claim with particularity as required by Rule 9(b) and his claim lacks sufficient factual foundation to demonstrate that TPW engaged in a fraudulent scheme. Nathan claims that TWP "represented to [him] that he would be entitled bonuses and an equity position under the Contract, when in fact TPW . . . had no intention of honoring those representations," (Compl. ¶ 82), and that TPW "made promises and representations that [it] would render performance due under the Contract, when in fact, at the time those promises were made, TPW . . . had no intention to perform." (*Id.* ¶ 83.) Nathan fails to allege when, where, and how these alleged representations took place. *See DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("[T]he 'circumstances' [of the fraud] must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." (citing Fed. R. Civ. P. 9(b)). Moreover, the allegations of the complaint strongly suggest that Mastic

recruited Nathan to TPW and did intend to honor the contract, but when Kutey and Kamp replaced him, the relationship soured. Under these facts, it is difficult to see how Nathan can plead this claim in good faith. Nonetheless, TPW's motion to dismiss Count V is granted without prejudice.

###### E.     Count VI: WPCA Violation

Finally, Nathan alleges that TPW violated the WPCA by failing to pay him compensation owed to him under his employment contract. To establish a claim under the WPCA, Nathan must plead that wages or final compensation is due to him as an employee from an employer under an employment contract or agreement. *See* 815 Ill. Comp. Stat. 115/2, 3 & 5; *Landers-Scelfo* v. *Corporate Office Sys., Inc.*, 827 N.E.2d 1051, 1059, 356 Ill. App. 3d 1060, 293 Ill. Dec. 170 (2005). With exceptions not relevant here, the WPCA only applies to "all employers and employees in [Illinois]." 820 Ill. Comp. Stat. 115/1. Section 2 of the WPCA defines "employer" as "any . . . limited liability company . . . where wage payments are made directly or indirectly by the . . . business for work undertaken by employees under hire to a third party pursuant to a contract between the business . . . with the third party." *Id.* § 115/2. The WPCA does not typically apply to employers that are based out-of-state. *See, e.g., Glass* v. *Kemper Corp.*, 920 F. Supp. 928, 931 (N.D. Ill.1996) ("the Wage Act applies to a group consisting of employers and employees, all of whom are in Illinois"); *Khan* v. *Van Remmen, Inc.*, 756 N.E.2d 902, 913, 325 Ill. App. 3d 49, 258 Ill. Dec. 628 (2001) ("[A]n Illinois resident does not have a cause of action against an out-of-state employer under the Wage Act."). Occasionally, however, the court has allowed WPCA claims to proceed against employers that are based in other states. *See, e.g., McGreal* v. *Semke*, --- F. Supp. 2d ----, 2011 WL 5868235, at

*5 (N.D. Ill. Nov. 22, 2011) (declining to dismiss WPCA claim where plaintiff alleged that out-of-state employer maintained an office in Illinois, marketed its services in Illinois and conducted substantial business in the state); *Musso* v. *Excellence in Motivation, Inc.*, No. 10 C 3236, 2010 WL 3385452, at *1–2 (N.D. Ill. Aug. 24, 2010) (denying motion to dismiss WPCA claim where complaint alleged that out-of-state employer "not only conducts substantial business in Illinois, but also maintains offices and a registered agent in the state").  Absent allegations of substantial in-state activity, however, courts have declined to subject an out-of-state employer to the demands of the WPCA.  *See, e.g.*, *Dental Health Prods., Inc.* v. *Ringo*, No. 08-C-1039, 2011 WL 3793961, at *4 (E.D. Wis. Aug. 25, 2011) (dismissing WPCA claim against corporation incorporated in Wisconsin with its principal place of business in that state); *Maxwell* v. *Vertical Networks, Inc.*, No. 03 C 5715, 2005 WL 950634, at *10 (N.D. Ill. Mar. 18, 2005) (California corporation that retained Illinois resident to sell products in Illinois was an out-of-state employer for purposes of the Wage Act); *see also Porter* v. *Time4Media, Inc*., No. 05 C 2470, 2006 WL 3095750, at *6 (N.D. Ill. Oct. 30, 2006) ("This Court finds the conclusions reached in *Maxwell*, *Glass*, and *Khan*, that the Illinois Wage Act does not provide an Illinois employee with a cause of action against an out-of-state employer, persuasive.").

TPW is a Delaware limited liability company with its principal place of business in Florida.  (Kutey & Kamp Affs. ¶ 3; Compl. ¶ 7.)  Although TPW maintained an office in Illinois to accommodate Nathan's desire to work in this state, and as of April 22, 2011, continues to employ one employee here, TPW is not licensed to do business in Illinois, has no registered agent or bank accounts in the state and does not sell any products or have any projects in Illinois.  (Kutey & Kamp Affs. ¶¶ 4, 5, 17.)  Absent allegations that TPW conducts substantial business in

the state, the court declines to apply the holdings of *McGreal* and *Musso* to the facts of this case. Defendants' motion to dismiss the WPCA claim against TPW is therefore granted

## V.     Motion to Transfer Venue Under § 1404(a)

Finally, TPW moves to transfer venue "[f]or the convenience of the parties and witnesses" to the Southern District of Florida under 28 U.S.C. § 1404(a). To do so, TPW must show that (1) venue is proper in this district; (2) venue is proper in the transferee district; (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interest of justice. *Gueorguiev* v. *Max Rave, LLC*, 526 F. Supp. 2d 853, 856 (N.D. Ill. 2007); *Bryant* v. *ITT Corp*., 48 F. Supp. 2d 829, 832 (N.D. Ill. 1999). TPW bears the burden of demonstrating their proposed forum is "clearly more convenient" under the circumstances. *See Coffey* v. *Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986). When considering which district is more convenient for the parties and witnesses, the court analyzes five factors including (1) the plaintiff's initial choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience of the parties litigating in their respective forums. *Digan*, 2010 WL 3385476, at *4. Weighing these factors involves a large degree of subtlety, and the decision to transfer rests within the sound discretion of the trial court. *Coffey*, 796 F.2d at 219.

As to the first factor, venue is proper in this district as discussed in part III, *supra*. Venue is also proper in the Southern District of Florida because the documents relevant to Nathan's Title VII claim are maintained and administered there. (*See* Kutey & Kamp Affs. ¶¶ 33–34.) The court may grant TPW's' motion if it can show that the Southern District of Florida is clearly more convenient for the parties and witnesses in this case.

As to the first convenience factor, "a plaintiff's choice of forum is generally entitled to substantial deference, particularly where the chosen forum is the plaintiff's home forum." *Brandon Apparel Grp., Inc.* v. *Quitman Mfg. Co. Inc.*, 42 F. Supp. 2d 821, 833 (N.D. Ill. 1999); *see also United Air Lines, Inc.* v. *Mesa Airlines, Inc.*, 8 F. Supp. 2d 796, 798 (N.D. Ill. 1998) ("[T]he balance must weigh strongly in the defendant's favor before a plaintiff's choice of forum will be disturbed.") At the same time, a "plaintiff's choice of forum has reduced value where the forum lacks any significant contact with the underlying cause of action." *Hotel Constructors, Inc.* v. *Seagrave Corp.*, 543 F. Supp. 1048, 1050 (N.D. Ill. 1982).

Here, Nathan's choice of forum bears a relationship to his claims. Nathan resides here, the employment contract at issue was sent to him here, and TPW maintained an office here where Nathan worked. Moreover, the confrontation between Nathan, Kutey and Kamp that ultimately lead to Nathan's termination took place here, and both Kutey and Kamp admit to making calls and sending letters and e-mails to Nathan here. (*See* Kutey & Kamp Affs. ¶ 22.) Accordingly, Nathan's choice of forum is entitled to substantial deference. *See Digan*, 2010 WL 3385476, at *4 (finding the first convenience factor met where the plaintiff lived, worked, and received notice of her termination in the district); *Prokop* v. *Stonemor Partners LP*, No. 09 CV 4323, 2009 WL 3764103, at *3–4 (N.D. Ill. Nov. 9, 2009) (affording plaintiff's choice of forum substantial weight where plaintiff lived in the forum and worked in the forum for five months).

Next, the court must consider the situs of the material events. TPW asserts that Jerry Johnson, who is based in TPW's California office, was in charge of all personnel matters. (Kutey & Kamp Affs. ¶ 11.) Nathan alleges, however, that TPW's Florida-based officers were involved in personnel decisions relevant to Nathan's claims. (*See, e.g.,* Compl. ¶¶ 77, 83, 95.)

Even assuming *arguendo* that all relevant employment decisions were made outside Illinois, neither Florida nor California constitute the situs of all material events because Nathan lived and worked in Illinois and felt the effects of TPW's unlawful conduct here. *See Digan*, 2010 WL 3385476, at *4 ("[T]here is some authority in this district for determining that venue is proper in the location in which a plaintiff felt the effects of a decision made in another district.") (collecting cases). Because the situs of material events is not concentrated in either venue, this factor is afforded reduced weight. *See id.*

The third convenience factor is the ease of access to sources of proof. Aside from Nathan's employment contract, which was sent to him in Illinois, the record does not indicate whether any documents relevant to Nathan's claims can be found in Illinois. TPW, on the other hand, states that the vast majority of documents related to Nathan's claims are located on TPW's computer systems in Florida and California. (*See* Kutey & Kamp Affs. ¶¶ 33–34.) These days, however, documents are presumed to be easily transportable and their location need not dictate the location of the litigation. *See Digan*, 2010 WL 3385476, at *5 ("documents now are easily scanned, stored, and electronically transmitted . . . [and] moving them no longer creates the onerous burden it may once have imposed"); *Rabbit Tanaka Corp. USA* v. *Paradies Shops, Inc.*, 598 F. Supp. 2d 836, 840 (N.D. Ill. 2009) ("In this day and age, transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town."). This factor does not favor transfer.

The fourth factor is the convenience to the witnesses and parties. "The convenience of witnesses is often viewed as the most important factor in the transfer balance." *Rose* v. *Franchetti*, 713 F. Supp. 1203, 1214 (N.D. Ill. 1989). In evaluating this factor, the court considers the number of witnesses located in each forum and the nature and importance of their testimony. *Rohde* v. *Cent. R.R. of Ind.*, 951 F. Supp. 746, 748 (N.D. Ill. 1997). Nathan resides in Illinois and Kutey and Kamp reside in Florida. All three witnesses are likely to provide critical testimony about Nathan's performance, the terms and conditions of his employment, and the circumstances surrounding his termination. Besides Kutey and Kamp, Johnson, the other current TPW employee, is based in TPW's California office. (Kutey & Kamp Affs. ¶ 11.) As a general rule, "[c]ourts are less concerned about the burden that appearing at trial might impose on witnesses who are either employees of parties or paid experts" because "it is presumed that such witnesses will appear voluntarily." *Bullard* v. *Burlington N. Santa Fe Ry. Co.*, No. 07 C 6883, 2008 WL 4104355, at *4 (N.D. Ill. Aug. 29, 2008). Moreover, it is unclear from the record whether Mastic, TPW's former CEO, and the female manager who complained about Kutey and Kamp's conduct, reside or work in the Southern District of Florida; defendants only state that they do not live or work in Illinois. (Defs.' Mot. to Dismiss at 34; Kutey & Kamp Affs. ¶¶ 36–37.) This factor does not clearly favor transfer.

As for the convenience of the parties to the suit, each party's respective residence and ability to bear the expenses of litigation in a particular forum is relevant to the court's inquiry. *Brandon Apparel Grp., Inc.*, 42 F. Supp. 2d at 834. The court may not, however, simply "transform[] an inconvenience for one party into an inconvenience for the other party." *Id.* (internal quotation marks and citation omitted.) While Nathan does not specifically address the

38

personal and financial inconvenience of litigating in Florida, the court presumes that his decision

to file suit in the Northern District of Illinois was partially motivated by his desire to litigate his

claims in his home forum. Defending litigation in Illinois is undoubtedly inconvenient for TPW,

which is a small company whose employees are scattered throughout the United States. (*See*

Kutey & Kamp Affs. ¶ 5 (stating that TPW has twenty-one employees in seven different states)).

Nonetheless, TPW has not shown that it is unable to bear the expense of litigating in Illinois, nor

has it shown that proceeding in this forum would impose a "hardship on [it] far out of proportion

to that imposed on the plaintiff." *DHR Int'l, Inc.* v. *Accounting Prof'ls Fin. & Tax Serv., Inc.*,

No. 92 C 5999, 1993 WL 69647, at *4 (N.D. Ill. Mar. 11, 1993); *compare Promatek Med. Sys,

Inc.* v. *Ergometrics, Inc.*, No. 89 C 6913, 1990 WL 19491, at *4 (N.D. Ill. Feb. 15, 1990)

(rejecting transfer where defendant failed to show, *inter alia*, that it would suffer undue hardship

by being forced to litigate in the foreign forum or that plaintiff was better able to bear the

expense of litigating in defendant's chosen forum), *with Adams Apple Distrib. L.P.* v. *Powell*,

No. 95 C 6270, 1996 WL 34469, at *4 (N.D. Ill. Jan. 26, 1996) (transferring case to defendants'

chosen forum where defendant company was small and completely dependent on defendant

employee for its day-to-day operations). Transferring the present action to the Southern District

of Florida merely shifts the inconvenience of litigation from TPW to Nathan and therefore

weighs against granting TPW's motion.

Finally, in deciding whether transfer is in the interest of justice, a court should consider

"(1) the speed at which the case will proceed to trial; (2) the court's familiarity with applicable

law; (3) the desirability of resolving controversies in each locale; and (4) the relation of each

community to the occurrence at issue." *Allied Van Lines, Inc.* v. *Aaron Transfer & Storage, Inc.*,

200 F. Supp. 2d 941, 946 (N.D. Ill. 2002). Comparing the dockets in the two forums, civil suits

are disposed of and proceed to trial faster in the Southern District of Florida.[21] As for applicable

law, either court is equally capable of applying Title VII and state law principles of tort and

contract law, although this court is more familiar with Illinois law and the nature of Nathan's

claims. As for the third factor, both Illinois and Florida have an interest in resolving the present

controversy as it involves retaliation against an Illinois employee by a Florida-based company.

Illinois, however, has a particular interest in preventing discrimination against its citizens,

regardless of the location of the discriminatory actors. Proceeding to trial in Illinois is therefore

in the interest of justice.[22]

Taking the foregoing factors into account, the court concludes that TPW failed to meet its

burden under § 1404(a). Nathan's choice of forum is entitled to substantial weight and the court

remains unconvinced that proceeding in the Southern District of Florida is clearly more

convenient than proceeding to trial here. TPW's motion to transfer venue is therefore denied.

## CONCLUSION

Defendants' motion to dismiss the second amended complaint under Federal Rules of

Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6) is granted in part and denied in part. (Dkt. #43.)

Defendants' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is granted as to

defendants Morgan Stanley Renewable Development Fund, LLC, Loraine Windpark Project,

---

[21] *See United States Courts, Federal Court Management Statistics Reports September 2011*, UNITED STATES COURTS, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics.aspx (last visited May 10, 2012).

[22] TPW also points to the fact that plaintiff filed his EEOC complaint in Florida to support its position that transfer to the Southern District of Florida is proper. In *Prokop*, 2009 WL 3764103, at *4, however, the court rejected a similar argument as irrelevant to the § 1404(a) analysis.

LLC, TPW Petersburg, LLC, James Kutey and Walter Kamp.  These defendants are dismissed from this case.  Defendants' Rule 12(b)(3) motion to dismiss for improper venue is denied. Defendants' motion to transfer venue pursuant to 28 U.S.C. § 1404 is denied.  Defendants' Rule 12(b)(6) motion to dismiss Counts I through VI against TPW is granted in part and denied in part.  Defendants' motion to dismiss Count I is denied; defendants' motion to dismiss Counts II through V is granted without prejudice; and defendants' motion to dismiss Count VI is granted. Nathan has until June 5, 2012 to file a third amended complaint against TPW, which may only include Counts I, II, III, IV, V and VII.  Nathan is directed to attach a copy of his EEOC charges to the third amended complaint.  The case is set for a status hearing on June 7, 2012 at 8:30 a.m.


Dated: May 22, 2012                                    ENTER:

                                                       _____
                                                       JOAN HUMPHREY LEFKOW
                                                       United States District Judge